Volume I, Pages 1-64

Exhibits 1-3

UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF RHODE ISLAND

Case No. 05-201-T

---

Allyn Reynolds

V.

Fluor Industrial Services,

Inc., et al.

---

DEPOSITION OF ESTELLE L. BOURQUE

93 Matteson Road

Scituate, Rhode Island

Tuesday, June 27, 2006

1:55 p.m. - 3:10p.m.

-----Reporter: Sonya Lopes, CSR-----

Eppley Court Reporting, LLC

Post Office Box 382

Hopedale, MA 01747

508-478-9795

APPEARANCES:

Representing Allyn Reynolds:
LAW OFFICE OF SANDRA A. LANNI
BY: SANDRA A. LANNI, ESQ.
33 College Hill Road, Suite 20D
Warwick, Rhode Island 02886
(401) 822-1800 Fax 822-1879
slanni@collegehill.necoxmail.com

Representing Fluor Industrial Services, Inc., et al.:
EDWARDS ANGELL PALMER & DODGE, LLP
BY: WINDY ROSEBUSH, ESQ.
111 Huntington Avenue, Suite 2000
Boston, Massachusetts 02199
(617) 239-0100



INDEX


| WITNESS: | EXAMINATION BY: | PAGE: |
|---|---|---|
| Estelle L. Bourque | Ms. Rosebush | 4 |

| EXHIBITS: | PAGE: |
|---|---|
| Exhibit 1, subpoena | 4 |
| Exhibit 2, statement | 33 |
| Exhibit 3, document | 49 |


(All exhibits retained by Ms. Rosebush)



(Subpoena, Exhibit 1, premarked)

MS. ROSEBUSH: The usual stipulations are going to apply. All objections except as to form and motions to strike are reserved until time of trial. The witness will have time to read and sign her deposition transcript once it's been transcribed.

ESTELLE L. BOURQUE,
having first been sworn under oath,
was examined and testified as follows:

EXAMINATION

BY MS. ROSEBUSH:

Q. Ms. Bourque, how long --

A. Mrs.

Q. Mrs. Bourque, how long would it take you to read and sign your deposition transcript?

A. How long would it take me to read it? What is it; two pages, about?

Q. No. Probably several hours worth of testimony.

A. You want me to read that and sign it when we're done today?

Q. No. The court reporter's taking down everything I say and everything you say. So we



cannot talk over each other. You have to let me finish what I'm saying before you start talking, and I will do the same for the purposes of the record.

A. Sure.

Q. Once your deposition is over, the court reporter will transcribe the deposition testimony you've given today into a written format which is a transcript. It's multiple pages long of everything I say to you and everything you say to me today and any objections Ms. Lanni makes and any questions she asks you.

Once that has been done, it will be sent to you. How long will it take you after you have it to read it, review it for any mistakes and sign it?

A. Well, I don't really know how long it's going to be. So how can I give an answer to that?

MS. ROSEBUSH: The witness will have 30 days --

A. I'll put -- 30? Fine.

MS. ROSEBUSH: The witness will have 30 days to read and sign the deposition transcript once it's been received.

BY MS. ROSEBUSH:

Q. Mrs. Bourque, do you understand you are

Page 6

under oath today --
A. I do. Sorry.
Q. -- as if you were in a court of law?
A. Yes.
Q. For the purposes of the court reporter, you'll have to answer the questions verbally and without nods or shakes of the head or pointing or gestures. Do you understand that?
A. Yes.
Q. If you need to take a break, please let me do so -- I will let you do so. But please answer the question on the table before you take the break. Is that fair?
A. Yes.
Q. If you don't understand my question or you didn't hear my question, please ask me to rephrase it and I will. If you answer a question, I will understand -- I will assume you understand it. Is that fair?
A. Yes.
Q. Can you state your full name for the record.
A. Estelle Louise Bourque, B-o-u-r-q-u-e.
Q. Is Estelle Bourque the only name you've

Page 7

gone by?
A. No. Estelle O'Connor previous.
Q. Was that your maiden name?
A. Uh-huh. Yes.
Q. When were you married?
A. December 24th this year -- well, last year.
Q. 2005?
A. Uh-huh.
Q. Is that your first marriage?
A. No.
Q. Were you previously married?
A. Yes.
Q. And what was your name when you were married previously?
A. Thomson, T-h-o-m-s-o-n.
Q. And what years were you Estelle Thomson?
A. '89 to '92 or 3.
Q. Have you gone by any other name other than Thomson or O'Connor or Bourque?
A. Lyons, L-y-o-n-s.
Q. Was Lyons another married name?
A. Yup.
Q. What year were you Estelle Bourque -- sorry, Estelle Lyons?

Page 8

A. I was 18 at the time. It lasted four months.
Q. Have you gone by any other name?
A. No.
Q. Have you been married other than the three marriages you've already testified about?
A. No.
Q. What's your date of birth?
A. 10/27/58.
Q. And your Social Security number?
A. 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.
Q. And your address is 93 Matteson Road in Scituate, Rhode Island?
A. Correct.
Q. How long have you lived here?
MS. LANNI: I'm sorry.
MS. ROSEBUSH: Go off the record.
(A break was taken)
MS. ROSEBUSH: Back on the record.
BY MS. ROSEBUSH:
Q. How long have you resided at this address?
A. Since December '05.
Q. Where did you live previously?
A. 19 Old Carriage Road in West Warwick, Rhode

Page 9

Island, 02893.
Q. How long did you live there?
A. About 18 months.
Q. What was your address prior to 19 Old Carriage Road?
A. I have a question. I moved 36 times. Do you want them all?
Q. No. You've literally moved 36 times?
A. Literally. My daughter is 14. She's moved 19 times.
Q. Is 19 Old Carriage Road the longest address you've had?
A. No.
Q. Where did you live for the longest part of your life?
A. When I was a -- 19 Bryant Place, B-r-y-a-n-t.
Q. Where is that?
A. West Warwick, Rhode Island.
Q. And what years did you live there?
A. From Age 3 to Age 15.
Q. Do you have an intent to move from this address in the next year or two?
A. None.

Page 10

Q. Do you have any physical or mental conditions that would prevent you from understanding my questions and answering them truthfully?
A. I would answer anything not a lie.
Q. Is there anything that you know of, any mental or physical condition that you have, that would prevent you from understanding the questions I'm asking you or from answering them truthfully?
A. Well, I'm on Klonopin.
Q. What is Klonopin?
A. It is to reduce the anxiety caused by the chemotherapy that I take.
Q. And why do you take chemotherapy?
A. Hepatitis C4.
Q. Do either the Klonopin that you take or the chemotherapy affect your ability to understand?
A. No.
Q. Do they affect your memory?
A. Yes.
Q. In what way?
A. Like I'll be, like, talking about something. And I'll be, like, forget it -- confusion, I would say. But anything that I will tell you I'll make sure in my own mind that it is

Page 11

absolute honest truth. It's more or less when I multitask that it happens, so you have my full attention.
Q. Do either of these medications affect your long-term memory, your memory of past events?
A. No.
Q. Showing you the subpoena issued to you that's been marked --
A. I don't have my glasses on. Does this mean I have to go to court? I'm going to be dead by then. I can't use your pen?
Q. For what?
A. You want me to sign that?
Q. No, ma'am. I'm showing you a document that's been marked as Exhibit 1.
A. Okay.
Q. It's a subpoena issued to you in this case for the deposition.
A. Okay.
Q. Do you recall receiving that by a constable?
A. Uh-huh.
Q. Is that your signature at the bottom?
A. Yes, it is.

Page 12

Q. And how do you sign your name?
A. Estelle O'Connor Bourque, Estelle Bourque.
Q. How did you sign your name before you were married?
A. Estelle O'Connor.
Q. Do you use the middle initial?
A. Sometimes I do, and sometimes I don't.
Q. Can you tell me what you did, if anything, to prepare for your deposition today?
A. Nothing.
Q. Did you review any notes?
A. No.
Q. Did you review any statements that you'd given?
A. No.
Q. Did you review any transcripts in this case?
A. No.
Q. Did you speak with anyone regarding this deposition?
A. No.
Q. Did you speak with Allyn Reynolds?
A. No.
Q. Did you speak with Ms. Reynolds' attorneys?

Page 13

A. No.
Q. When Ms. Lanni came in for the deposition today, you said hello to her. You said she looked different from the last time you saw her. Have you spoken with her in the past?
A. I gave her my deposition.
Q. When did you give her your deposition?
A. About three months ago.
MS. LANNI: Just for the record it wasn't a deposition. I came and spoke with Mrs. Bourque. I did not take any statement.
A. No. I didn't have to sign, anything like that.
MS. LANNI: I did not take any statements from her.
BY MS. ROSEBUSH:
Q. Was there any written statement that resulted from Ms. Lanni's visit with you?
A. I don't understand the question.
Q. Did you produce any written statement to Ms. Lanni at that meeting?
A. I didn't write anything.
Q. Did Ms. Lanni produce any written statement to you for your review or signature at that meeting?

Page 14

A. She took notes.
Q. Did she --
A. No, absolutely not.
Q. Did Ms. Lanni produce any written statement to you for your review or signature at that meeting?
A. No.
Q. You need to let me ask the whole question, and I'll let you answer so we're not talking over each other for her sake.
A. Uh-huh.
Q. Have you ever been deposed prior to today, which is what we're doing here with a court reporter --
A. No.
Q. -- with somebody asking you questions and you giving answers?
A. No.
Q. Have you ever given testimony in a court of law?
A. No.
Q. Have you ever given testimony before the Rhode Island Commission of Human Rights or the EEOC?
A. Could you explain what those are?
Q. Sure. They're administrative agencies for

Page 15

the purposes of addressing claims of discrimination.
A. No.
Q. Have you ever been a party in any lawsuit?
A. No.
Q. Do you know what that means?
A. I do. And I have a question. My previous husband had a lawsuit, but it didn't have anything to do with me.
Q. Were you a named party in the case?
A. No.
Q. Have you ever been a defendant in any lawsuit?
A. No.
Q. Have you ever been arrested?
A. Yeah.
Q. When?
A. I was 18 some -- whatever year that was. We were a bunch of kids at Howard Johnsons. And one of the young men took a television. And when we shut the door, my pocketbook was in there.
Q. What were you arrested for?
A. Stealing a television.
Q. Were you convicted?
A. It was not a larceny; under $500. And it

Page 16

was supposed to be expunged after a year.
Q. Did you plead guilty or no contest to the charge?
A. Yeah. I pleaded guilty.
Q. And it was your understanding that that charge was expunged?
A. It's my understanding because that's what they said. I never went back again.
Q. Were you over 18 years of age when you pleaded guilty to stealing the television?
A. No. I was 18.
Q. You were 18. Have you been arrested for any other criminal offense?
A. Driving on a suspended in Scituate, Rhode Island.
Q. How did your license get suspended?
A. Well, the answer is very complicated. Rhode Island didn't send my insurance information to New Hampshire, so New Hampshire suspended my license even though I was paying it and have proof that I was paying it. So it's a tristate thing. So when New Hampshire suspends you, Rhode Island suspends you.
Q. Your driver's license was where; in New

Page 17

Hampshire or Rhode Island?
A. The last one that I had was in New Hampshire.
Q. Did you previously hold a driver's license in New Hampshire -- Rhode Island?
A. Have I previously? Yes.
Q. So at some point in time your New Hampshire license was suspended for what you believe is an insurance-related issue?
A. No. Well, I was in -- it was suspended -- let me put it this way. I was in a car accident. It was a DUI. But I paid that, went through the six months. And then I paid the reinstatement fee of a hundred dollars, even though I didn't want to apply there. That's part of their law that you pay a reinstatement fee.
I paid a reinstatement fee in Concord, New Hampshire; reapplied here in Rhode Island. Four days before I was supposed to get my license back, they informed me that it's been suspended because New Hampshire hadn't gotten any information that I had insurance, which I do have proof of.
Q. Let's go back to the beginning, then. When was the car accident that started all of this in

Page 18

motion?
A. Three and a half years ago, four years ago, three and a half. Yeah.
Q. And you were arrested for driving under the influence?
A. Yeah.
Q. Were you convicted of driving under the influence?
A. Yup.
Q. How long were you sentenced to?
A. I wasn't sentenced.
Q. What was your --
A. I lost my license for six months.
Q. You were then subsequently arrested for driving with a suspended license?
A. Here in Scituate.
Q. When was that?
A. Two years ago.
Q. Were you convicted of --
A. Yes. I pleaded guilty. I had a big fine. I don't know exactly how much it is. I don't know exactly how much the fine was for; thousands.
Q. Have you been arrested or charged with any other criminal offense?

Page 19

A. No.
Q. Do you currently have a Rhode Island driver's license?
A. No.
Q. Do you currently have a New Hampshire driver's license?
A. No.
Q. Do you currently have a driver's license in any state?
A. No.
Q. Are you prevented from applying for or --
A. No. Sorry.
Q. Are you prevented from applying for a driver's license in any state?
A. Repeat it.
Q. Have you been told that you are prevented from --
A. No.
Q. -- reapplying -- ma'am, you have to let me ask the questions. Otherwise, the deposition transcript's going to be all choppy.
A. I thought you were done.
Q. I wasn't.
A. Ma'am, I thought you were finished. I'll

Page 20

wait.
Q. Okay.
A. Ask again, and I'll answer it.
Q. Have you been told by any state that you are not eligible to apply for a driver's license --
A. No.
Q. -- in that state?
A. Oh, no.
Q. Can you tell me your educational background?
A. I quit school at Toll Gate. I was in the Health Corps. They call it the Health Corps. It was to be a CNA. I quit there, went back; got my GED and did get my CNA years after.
Q. Your CNA is a certified nurses assistant certificate?
A. Correct.
Q. What grade did you quit school?
A. Eighth.
Q. What year was that?
A. Let me think it out. What year was it when I was 16?
Q. You were 16 in the eighth grade?
A. Yeah.

Page 21

Q. How many years did you stay back prior to the eighth grade?
A. Well, I started the next year of school. But I didn't finish that next year, so the last year completed was eighth.
Q. And you were 16 at that time?
A. Correct.
Q. How many years later did you get your GED?
A. When I was 32.
Q. And where was the Health Corps course that you were -- course that you were describing?
A. Well, I took a few of them. There was one that I took in Massachusetts after I got my GED, and I don't remember the name of the place. Now that license had run out after a few years, so I took it again at South County Hospital.
Q. Where is that?
A. South County Rhode Island.
Q. Any other classes?
A. Yup. Then that license ran out, and there was a long period of time in between jobs. So that license ran out. And I took another one here in Rhode Island at Haven Health Center nursing home in Coventry, Rhode Island. I got my CNA license there.

Page 22

Q. When were you first licensed as a CNA?
A. Can I ask a question or tell you something?
Q. Sure.
A. I was working as a CNA before it was required that you be licensed for one. So I was working as a CNA when I was 17, but I didn't get licensed until the one in South County.
Q. Which is when?
A. '93.
Q. And you said that --
A. I'm sorry. You interrupted me. I wasn't finished. I think it was -- then I got another one after that.
Q. Right. I understand that. When did the license that you first received in 1993 lapse?
A. I don't know.
Q. When did you get relicensed as a CNA?
A. From the time of when?
Q. Well, you said you were first licensed in 1993. When were you relicensed as a CNA?
A. It would have been the one from Haven Health, I believe.
Q. And what year was that?
A. Three years ago, three and a half years

Page 23

ago.
Q. Have you maintained that license since approximately 2003?
A. Question: Can I go check and look at my license?
Q. If you would like.
A. Okay. Then I can tell you when it ran out. Here we go.
Q. You've handed me a nursing assistant's license issued by the State of Rhode Island that says it expires June 30, 2005; License No. NA31615 with an active status with your signature on the back. It doesn't say when you received it. Do you know how long in between renewals you have for licenses in Rhode Island?
A. No. I'm not working now anyway.
Q. So is your best estimate you were relicensed about three years ago or in about 2003?
A. Yeah.
Q. That was after you left Fluor?
A. Yes.
Q. Is that about a year after you left Fluor?
A. Before a year.
Q. How long approximately --

Page 24

A. Oh, I'm sorry. I'm sorry. I started the classes before a year was up, but the licensing didn't come in until later on.
Q. How long after you left Fluor did you start your classes for your CNA license?
A. Well, I have a question. Do you want to know about other jobs I've had in between them?
Q. I will ask you about that, but my question is specific. After you left Fluor, when did you start your classes for your CNA license?
A. About three months.
Q. And that was at the Haven Health Center?
A. That's correct.
Q. Can you describe for me your employment history starting with the first job you had following your completion of your GED?
A. After my GED, I have had so many jobs. I cannot remember, honestly.
Q. You said you got your GED when you were 32, which was in 1990.
A. Uh-huh.
Q. To the best of your memory, tell me each job that you had -- and I'll ask you some questions as we go along. Tell me each job you've had since

Page 25

1990 to the present.
A. Nothing very memorable, obviously. I did some waitress work.
Q. Where were you a waitress?
A. Valley Country Club in Warwick, Rhode Island.
Q. What year was that?
A. Three and a half years ago.
Q. Was that job after you left Fluor or before?
A. After.
Q. What's the first job you can recall having after you received your GED in 1990?
A. I was a bartender. I don't really remember the name of the business.
Q. Do you remember the location?
A. It was in Providence near the hospital. I don't think the building's there anymore.
Q. What year were you a bartender?
A. Can I ask a question?
Q. Sure.
A. What year was the GED again?
Q. I'm guessing, based on your testimony that you were 32 when you got it and adding that to your

Page 26

birth date, that was 1990.
A. I was about 35 when I worked there for about a year.
Q. So in about 1993?
A. Yeah. In about that. Yeah.
Q. Is that the first job you can recall having after you got your GED?
A. Yes. Because I was just getting divorced. And I was in the middle of school, too, and also raising three small children.
Q. What school were you in in 1993? Is that your CNA license?
A. In '93?
Q. Yes.
A. That was at South County Hospital.
Q. Prior to 1993 did you have work outside the home, or were you primarily a homemaker?
A. Primarily. Always primarily a homemaker.
Q. Was the bartending job full time or part time?
A. Part time.
Q. How many hours a week?
A. Eighteen to twenty.
Q. Why did you leave that job?

Page 27

A. My daughter broke her clavicle, and she couldn't go to day care.
Q. When did you leave?
A. Immediately when she did that.
Q. When did she break her clavicle?
A. About a year into my job.
Q. What is the next employment that you had outside of the home after your bartending position?
A. I'm trying to think back. I went to Maryland. Right after my daughter was healed, I went to Maryland. I didn't work while I was there. I came back eight months later, and I ran my own day care for five years in my home.
Q. What was your day care called?
A. It wasn't -- if you have under four children, you don't have to be licensed in Rhode Island.
Q. So you provided day care to children -- for less than four children in your home?
A. Correct.
Q. It's your testimony that you do not require a license to do that?
A. Not at that time. If there is now, I don't know.

Page 28

Q. What address did you provide day care at?
A. There were two addresses. Spring Street was one of them and --
Q. What city?
A. West Warwick. The other one was in West Warwick also. Begins with an H. I can't really remember the name of the road right now. It might come to me later.
Q. What years did you have a day care; from what year to what year?
A. Let's see. Dillon was four, and that was until I moved up to New Hampshire. Five years I did it for.
Q. What time frame?
A. Let me see. I was eight months in Maryland. I started day care as soon as I got back here. Like from '95 or -- it was five months after I returned. Five years I did it for after I returned from Maryland.
Q. You said you bartended for a year and then you were in --
A. That was before I went to Maryland.
Q. Right. You bartended in 1993 for about a year. Then you went to Maryland for eight months.

Page 29

That puts us in about 1995.
A. There were so many different little things in between that it's hard for me to just, you know -- it's hard for me to recall, like, every little itsy-bitsy little job that I had because my primary role was in the home with the children. And then, of course, it was ideal that I do the day care.
After I left the day care, I moved in with my mother in New Hampshire -- Plymouth, New Hampshire -- so she could take care of the children while I worked. And I took care of an elderly woman there.
Q. I understand you might not know the exact dates. I'm trying to get time frames. Is it your testimony that you had a job in between returning from Maryland and starting your day care?
A. I'm sorry?
Q. Is it your testimony that you had other jobs in between returning from Maryland and starting a day care?
A. No, I didn't. I returned from Maryland and started my day care immediately.
Q. Is your best estimate as to when that began in or about 1995 when you returned from Maryland?

Page 30

A. When I returned from Maryland.
Q. And that you had the day care until approximately 2000?
A. Yeah. Five years exactly.
Q. And then how long were you unemployed after discontinuing your day care?
A. I started the same month that I left my day care; as a matter of fact, the same week up in Plymouth -- in Laconia, New Hampshire, giving health aid to or CNA work to Mary Antigo who owned a hotel up there.
Q. And you were residing in New Hampshire at the time?
A. I was.
Q. And you resided with your mother?
A. Yes, I was.
Q. What was that address?
A. 1029 Texas Hill Road, Plymouth, New Hampshire. I don't know the ZIP.
Q. Other than your three children, how many other children did you take care of in the day care that you ran?
A. Three; mostly two but sometimes three.
Q. And how long were you a health aid for

Page 31

Ms. Antigo in Laconia, New Hampshire?
A. About 18 months. I don't know exactly.
Q. From 2000 to mid-2002?
A. Yeah. About 18 months.
Q. Are those dates the approximate dates that you worked there?
A. Approximate.
Q. What was your next job after that?
A. I moved back to Rhode Island.
Q. Why did you leave the health aid work?
A. Why did I leave there?
Q. Yes.
A. I wanted to be here.
Q. You wanted to move back to Rhode Island?
A. Uh-huh.
Q. And what was your next job after moving back to Rhode Island?
A. Clariant or Fluor Industries.
Q. Who was your employer?
A. I was told my employer was Lou Ward.
Q. Who told you that?
A. He did.
Q. Did Lou Ward sign your paychecks?
A. No. But he said he did. I never really --

Page 32

he would say "Don't forget who signs your paychecks."
Q. Did you ever see Mr. Ward's name --
A. No.
Q. -- on either the top or the signature line of your paychecks?
A. No. I never really looked.
Q. Which company was the name on your paycheck?
A. Fluor.
Q. How did you find out about the job at Fluor?
A. I didn't find out. I just stopped in and got the job.
Q. When did you stop in at Fluor to get the job?
A. The date? I don't know. I don't know the date.
Q. Do you have the month or the year?
A. Let's see. Can I see this and back up?
Q. These are my notes, ma'am.
A. You can call me Estelle.
Q. I thought you wanted me to call you Mrs. Bourque.

Page 33

A. No, definitely not. Just call me Estelle. What date? Okay. It was in the spring because I was walking at the time. So when I came back from New Hampshire -- let's call it May because it's around there. Okay? It's around that time.
MS. ROSEBUSH: Mark this as Exhibit 2.
(Statement, Exhibit 2, marked)
BY MS. ROSEBUSH:
Q. Showing you a document that's been marked as Exhibit 2. Do you recognize this document?
A. March to November. I knew it was springtime anyway. I used to go to work crying too; not only leave there but get there crying.
Q. Ma'am, my question is whether or not you recognize Exhibit 2.
A. I recognize this, yup.
Q. What is this document?
A. I think this is the one that I had written out for Ms. Reynolds, I think.
Q. Is that your handwriting?
A. No.
Q. Whose handwriting is that?
A. Hers; if this is, in fact, the one I wrote out for her.

Q. What do you mean you wrote out for her?
A. That I just told her, and she wrote it out. I think this is the one. I thought she was doing it on a typewriter or a computer. As a matter of fact, I'm sure hers was on a computer.
Q. How many statements have you given to Ms. Reynolds?
A. What's a statement? Like is it legal? I'd just tell her what happened. I told her what happened.
Q. How many times have you told her what happened and she wrote it down?
A. We've had a few conversations, but the first time I just told her the whole story.
Q. How many times have you told Ms. Reynolds anything about your time at Fluor and she wrote it down?
A. Wrote it down? Once.
Q. Then what is this document?
A. Twice. I'm sorry. Twice.
Q. So this is Ms. Reynolds' handwriting on Exhibit 2?
A. Uh-huh.
Q. And on the last page of Exhibit 2, there's



a signature.
A. Yup. That's my birthday. This is when we met at a coffee shop. And my fiance -- my husband now -- was present.
Q. What's your husband's name?
A. George Emery Bourque.
Q. Did Mr. Bourque ever work at Fluor or the Clariant facility?
A. No.
Q. And what is the date that you've signed this document?
A. It was 10/27/03.
Q. According to this document, you worked at MNIS at Clariant Corp. from March 2002 to November 2002.
A. Correct.
Q. Is that accurate?
A. I don't know exactly the date. I'm going to have to say that. I did say that sometimes I get confused with the Klonopin. So I worked there, I think it was, from March until November. Yup.
Q. When did you start taking Klonopin?
A. It's when I started getting the side effects of anxiety from the chemo.



Q. In what year?
A. October of '05.
Q. This statement is dated October 27, 2003.
A. Correct.
Q. So two years before you started taking Klonopin.
A. So yeah. Then it's right.
Q. So the statement says -- not in your handwriting but in Ms. Reynolds' handwriting -- you worked there from March 2002 to November 2002; correct?
A. Correct. But if there is, like, a difference between a month or two or something, you know, I didn't know where this was going at the time. I didn't think I'd be sitting at my kitchen table sick talking to you people about this, dates and all this other stuff that I don't find important.
So if there's a discrepancy on a date here and there, I can't guarantee it's completely 100 percent accurate what date it was.
Q. What was your understanding of the purpose of this document?
A. Well, she wanted to go to court and take



him go to court. I said "What you're telling me he did to you is nothing compared to what he did to me." I said, you know, "He should get whatever he deserves." I just thought I was helping her out by giving her this information.
Q. How do you know Allyn Reynolds?
A. She contacted me.
Q. How did she find you?
A. I don't know.
Q. Was October 27, 2003 the first time you met her?
A. Yes.
Q. And she called you out of the blue?
A. Yes.
Q. And how did she say -- what did she say to you when she called you?
A. She told me who she was. She told me that she had worked for Lou Ward at the guard shack and that she wanted to take him to court and did I have any problem with him when I worked there. And I said "Boy, do I got a story for you." And I gave her my story.
Q. How did she get your name?
A. I have no idea.

Q. Did you ask her?
A. No --
Q. Did she tell you?
A. -- or I don't know. I don't know how. I don't know how she got it, and I don't know if I asked her how she got it.
Q. Prior to her calling you on the phone -- go ahead.
A. I'm sorry. I remember that she said Charlie, who used to work in the guard shack, said that a girl named Estelle had a lot of problems with Lou and that maybe I could help her.
Q. What's Charlie's last name?
A. I have no clue.
Q. Did you work with Charlie?
A. Yes, I did.
Q. When did Ms. Reynolds call you?
A. I don't know exactly the time or month.
Q. The statement was signed on October 27, 2003; correct?
A. So maybe a couple of weeks before that.
Q. Do you know when she was terminated from Fluor?
A. No.



Q. Are you aware that she was terminated on October 5, 2003?
A. No.
Q. Did she contact you prior to October 5, 2003?
A. No.
Q. Sometime after October 5, 2003?
A. Yes.
Q. Did she tell you she was fired?
A. Yes.
Q. Did she tell you why she was fired?
A. No. She told me that she found it very difficult to work with Lou. She told me things that if that was my problem, I would still be working there because he was so overboard with me, you know.
Q. Did you think her complaints were minor?
MS. LANNI: Objection. You can still answer.
A. I felt that mine were -- I think what he did to me was worse.
BY MS. ROSEBUSH:
Q. My question was: Did you think her complaints were minor?
A. No. No, I don't. No. Not the way --



Q. Why did you testify you would still be working there if that was what happened to you?
A. Because I'm a worker, you know. I have to feed my kids. She has dogs, you know. I have children. There's a big difference. The only reason I stayed there and didn't walk out the very first day is because of my children.
Q. You testified earlier that you were primarily a homemaker and that you only worked part time.
A. Uh-huh.
Q. Who was supporting you and your children?
A. I don't want to answer that question.
Q. Well, you have to.
A. Why? I'm not in court.
Q. You misunderstand. You're under a subpoena to answer my questions. The only reason we're sitting in your house today is to accommodate you.
A. Seems like I'm accommodating you. But I lived with different people.
Q. So whoever you lived with supported your children?
A. I was on welfare also.
Q. So you didn't need a job.



MS. LANNI: Objection.
A. I definitely needed a job.
BY MS. ROSEBUSH:
Q. Have you told me about every job you've had between the time you were an adult and the time -- to the present?
A. No. But I would like to add that the reason that I stayed home with my children was because my children were molested by their father at the age of five and three. So from that time on, I did not leave them.
Q. You never left your children?
A. I never left my children after that time. That's why I was a homemaker and wasn't out working because I was doing my main job. My important job was taking care of these kids and getting their life back on track, which I've done.
Q. Who's their father?
A. Kurt Alexander Thomson, T-h-o-m-s-o-n. We've been to court. I didn't want the kids to testify or the court didn't feel as though they were old enough to testify. They were five and three at the time.
Q. You divorced Mr. Thomson in 1993; correct?

Page 42

A. Uh-huh.
Q. And you had jobs outside the home after 1993; correct?
A. Yup. That's when I worked as a bartender, but I didn't find out they were molested until after that.
Q. What are the dates of birth of your children?
A. Michelle is -- well, Dominic is 26; March 27, 1980. Michelle is February 25, '89. And Dillon is October 15, '92.
Q. And you said that there was a time when your children were five and three that they were molested, and you didn't leave them after that. When did you discover that?
A. DCYF came to my house because Michelle disclosed at school to a teacher what had happened to her.
Q. What year was that?
A. She was five years old, so you figure it out; five years old.
Q. She was born in 1989?
A. Uh-huh.
Q. So 1994?

Page 43

A. Yes.
Q. And you've held jobs outside the home since 1994; correct?
A. Oh, yeah. They were older; once they got old enough to understand. That's why I did the day care so I didn't have to leave them. And that's why I moved up with my mother so that when I wanted to go out to work that they would be protected.
Q. So you did not have to work at Fluor Corporation. There were other things that you had done in the past --
A. Absolutely not.
Q. -- and other things you could do.
MS. LANNI: Objection.
A. I had no money, no car, no nothing. When I came back from New Hampshire, I came back with nothing. I got the job the very first day I looked for it. I praised God for the job. I got the job. That is what happened. They needed to have a home so they could go to school. You can't be homeless.
BY MS. ROSEBUSH:
Q. You previously had a day care in your home; correct? And you previously worked as a CNA; correct?

Page 44

A. Correct.
Q. And you previously worked as a bartender.
A. Correct.
Q. So Fluor Industries wasn't your only option to work there; correct?
MS. LANNI: Objection.
A. It was my only option. I didn't have an automobile. There were very limited places where I could work and walk and for my daughters to go to school that I could walk back and forth to school and walk back and forth to work.
BY MS. ROSEBUSH:
Q. If you had day care in your home, you wouldn't have to go anywhere; correct?
MS. LANNI: Objection.
THE WITNESS: Do I have to answer it?
MS. ROSEBUSH: Yes.
MS. LANNI: Yes.
A. Yeah. But where I was living, I couldn't have a day care.
BY MS. ROSEBUSH:
Q. Where were you living?
A. Andrews Avenue. I don't know the address exactly. I wasn't there that long.

Page 45

Q. And March of 2002, that was your address?
A. Uh-huh. No, it wasn't. You mean, March of 2000 when I began working for Fluor?
Q. You said you came back from -- you said you came back from New Hampshire --
A. For about two months I lived at another address, and I don't remember what the address was. But that's when I got the job. I was actually at that address. It's, like, up the street from Andrews Avenue. I don't know the address. I was only there for months.
Q. After you spoke with Ms. Reynolds on the telephone call, whose idea was it to meet --
A. Hers.
Q. -- at a coffee shop?
A. Hers.
Q. What did she say to you?
A. She asked me if I would talk to her about my story and her story. I said "Sure. Where do you want to meet?"
MS. LANNI: Can we go off the record for a minute?
(Off record discussion)
MS. ROSEBUSH: Back on the record.

Page 46

BY MS. ROSEBUSH:
Q. And you said you went to a coffee shop with your husband and met Allyn Reynolds.
A. I wasn't married to him at the time. But yes, I went with George Bourque.
Q. And where was the coffee shop?
A. In Coventry.
Q. Was anyone else present?
A. There were other people in the building, but I don't know who they were.
Q. What did she say to you?
A. She told me that she was filing some kind of lawsuit against him and wanted to know if anything had happened with me when I worked there.
Q. What did you say?
A. I told her "Yes." I told her my story. I also told her about Heather, this girl Heather who worked there when I was hired. And she was fired almost immediately after I was hired.
Q. Do you know that to be a fact that she was fired?
A. Yes.
Q. How do you know that?
A. Lou told me. Lou threatened quite a lot

Page 47

that he would fire people, but she didn't come back. He said she was fired, so I assumed she was fired.
Q. Do you have any firsthand knowledge about whether Heather either quit or was fired?
A. No. Just by what Lou said.
Q. What did you tell her?
MS. LANNI: Objection.
BY MS. ROSEBUSH:
Q. What did you tell Allyn Reynolds at your meeting at the coffee shop?
A. I told her that going to work there was hell. I told her his sexual comments. I told her about -- he tried to get me into prostitution. I kept telling him to stop telling -- talking like that. He said he could supply the johns -- you want to call them -- clients.
I don't know. I was disgusted, repulsed. And I was stuck, like, this far away from him -- feet away from him -- the whole day. It was really, really nerve-racking and difficult.
Q. When did Mr. Ward allegedly suggest that you should go into prostitution?
A. About three to four weeks after I started working there.

Page 48

Q. Why did you stay?
A. I had to support my children. And at that time I had no vehicle, and I needed a job that I could walk to with good benefits.
Q. Who did you report that to?
A. I'm sorry?
Q. Who did you report Mr. Ward's statement to?
A. I reported Mr. -- to John Ward. They weren't received well at all.
Q. Within three to four weeks of starting at the job, it's your testimony you reported to Mr. John Ward that Lou Ward suggest you enter into prostitution?
A. No. If you wrote that, you must have misunderstood because he said those things three to four weeks after I started working there. But I did not report them because I was afraid to. I didn't report them until a few weeks before I had to leave work in March or November; November.
Q. November of 2002?
A. Uh-huh. Once I reported what he was doing to John Ward, they changed my shift because they knew it was impossible for me to work with my kids at -- they would never see me if I worked second

Page 49

shift.
Q. You actually requested a change in shift, did you not?
A. No.
Q. You actually told Lou Ward that you planned to ask for a change of shift, did you not?
A. No, not that I remember.
MS. ROSEBUSH: Mark this as the next exhibit.
(Document, Exhibit 3, marked)
A. There was some talk about going on third shift. And he threatened to have my children taken away; that if I -- that he had the power to do that because he was a police officer or an ex-police officer.
BY MS. ROSEBUSH:
Q. My question was: Did you discuss with Lou Ward that you were planning on asking for a change in shift? And you said no; correct?
A. I wanted to stay on my shift.
Q. Who talked about moving you to the third shift?
A. I don't remember.
Q. Where did that statement come from, then?

Page 50

A. Might have been just something I was thinking of, like anything to get out of the situation I was in.
Q. Lou Ward was not a police officer in 2002. Isn't that correct?
A. I have no idea. He told me that he worked for the police department, did special jobs for them and also went on -- what do you call them when you sit and watch somebody?
Q. Do you have any firsthand knowledge about whether or not Mr. Ward was a police officer in 2002?
A. I do now. He wasn't.
Q. And you worked with him. Your statement says you worked with him every day; correct?
A. Correct.
Q. So there's no reason for you to believe he was on the police department, is there?
MS. LANNI: Objection.
A. No. Because he said that he would do private jobs for them when he was needed he. He also -- I also told him at one point that I could work as a CNA. And he said that he could get any nursing home shut down because he was with the

Page 51

department of health.
BY MS. ROSEBUSH:
Q. Is that true?
A. No.
Q. Was he ever with the department of health?
A. No. I don't know. I don't know.
Q. Did you at any point in time think that Mr. Ward had the power to shut every nursing home in the State of Rhode Island down?
A. I thought he could cause me trouble getting a job.
Q. That's not my question. My question is: Did you think that he had the power to shut down every nursing home in the State of Rhode Island?
A. No.
Q. Did you think he had the power to have your children taken away from you?
A. Yeah.
Q. What was the basis for that belief?
A. To call and say that they were home alone.
Q. Would you ever leave your children home alone?
A. Not at -- well, at a certain age, yeah; 11. Not for very long; not a whole shift.

Page 52

Q. In 2002 would you leave your children home alone?
A. It would have to depend on what time of day and the length of time; second or third shift, no, I couldn't.
Q. So there was no risk that you would have your children taken away because you would not leave them home alone; correct?
MS. LANNI: Objection.
A. I thought you just asked me if I thought Lou could do --
BY MS. ROSEBUSH:
Q. No. My question is: There's no risk that anyone could have your children taken away if you didn't leave them home alone at night. Isn't that fair?
MS. LANNI: Objection.
A. No. I believed he could because he was a liar.
BY MS. ROSEBUSH:
Q. Well, if someone came out --
A. He could lie and say "She did this. She did that." And he was -- he lied continuously.
Q. But if someone came out -- and you've had

Page 53

experience with DCYF. If someone came out and you had somebody watching your children, then whatever lie he told would have no consequence whatsoever.
MS. LANNI: Objection.
A. At that time I couldn't afford a baby-sitter, so I had to either work while they were in school or not at all.
BY MS. ROSEBUSH:
Q. At that time your youngest child was ten years old?
A. Yes.
Q. And your oldest child was 22?
A. He didn't live there.
Q. Your next oldest child what's 15?
A. Towards the end of it, yeah; 13, 14, 15. Yup.
Q. It's your testimony that you weren't able to leave them home alone?
A. I wouldn't leave a 14-year-old girl home alone now, no; not after what she'd been through.
Q. It's your testimony you never requested a change in shift?
A. There was talk about changing shifts. And before anything could -- I could actually formally

Page 54

ask for it, they changed me. As soon as I complained about Lou, they put me on --
Q. Who was having the talk about changing your shift?
A. John, Lou, myself.
Q. So you knew --
A. And everyone else that worked there all said, you know, "How can you stand working first shift?" I said "Well, how can I get out of it," you know; "I'm kind of stuck."
Q. Did you at any point in time bring up a request that you be changed off the first shift?
A. I don't remember.
Q. Did you ever discuss it with Lou Ward?
A. I believe we had to discuss it because he was the boss so -- I don't remember the exact conversation.
Q. Who ultimately made the decision about the shifts at the Fluor location at Clariant?
A. What I was told was Lou, but I found out it was either Buddy Henault or John Ward.
Q. Who ultimately made the decision to change your shift from the first shift to the 2 to 10 shift?

Page 55

A. I think John Ward, I think. This is a while ago, though, so --
Q. Showing you Exhibit 3. Down at the bottom you'll see some Bates label number that begins 00175.
A. You said paragraph 3?
Q. I'm showing you Exhibit 3, this document that's been marked.
A. I'm sorry?
Q. Do you see down at the bottom there's a Bates Label No. 00175?
A. Correct.
Q. Can you turn to page 178, the second paragraph -- the first full paragraph, third sentence down. Actually, start at the top: "I had mentioned to Lou that I wanted to work in a nursing home. He told me that when he worked for the health department" -- parentheses, "state" -- "he could get any nursing home shut down immediately and still could. I told him that I might go on to another shift because I cannot stand the stress"; correct?
A. Uh-huh.
Q. Is that accurate?
A. Yes, it is.

Page 56

Q. So before the time you were switched off the first shift, you brought up the fact you wanted to switch shifts; correct?
MS. LANNI: Objection.
A. Yeah. It was kind of done heatedly, obviously, if you read it. I mean, it's so hideous that this guy got away with this for so long. He would scream --
BY MS. ROSEBUSH:
Q. Why don't you wait until I have a question for you and answer those. You can't just keep talking on and on.
A. I think you're rude -- being rude right now.
Q. You might think so. You can't keep talking without any question pending before you.
MS. LANNI: I'm going to object to these arguments with the witness who's not a party to this case and who's not represented here. And you keep interrupting her in the middle of what she's saying, and I don't think that's appropriate.
I think if you have a problem with what she's saying on the record that you can move to strike it afterward. That's why we reserved those

Page 57

-- the right to ask for comments to be stricken.
MS. ROSEBUSH: I haven't once interrupted the witness. It's the witness who's interrupting me every time I ask a question for the record.
A. Do I have to go to court for this; because it's over now? I'm not going to go to court. I don't like the way your approach is, you know. Let me tell you exactly what this guy did, what he did to me and what he does to everybody else.
He had sex with a girl that used to work there. Then she committed suicide. And you're a woman sitting there right in front of me looking at me in the face like I did something wrong.
I did nothing wrong at Clariant. As a matter of fact, everybody that worked there will tell you I was an excellent worker.
BY MS. ROSEBUSH:
Q. That's not the information I have, ma'am. Are you done?
A. I want to be done because I don't feel good.
MS. ROSEBUSH: Are you recording this with audio?

Page 58

COURT REPORTER: No.
THE WITNESS: They don't know what I have been through with this guy.
MS. LANNI: I understand. But this is a deposition. And I just want you to -- I'm not your attorney. But I want to tell you that because you're under subpoena, which is a court order, that if you stop the deposition -- which, I mean, you can make your own decisions -- but the court can order the deposition reconvened at a different time.
THE WITNESS: Go ahead.
MS. ROSEBUSH: Let the record reflect the witness just picked up the exhibits and threw them at me.
THE WITNESS: I tossed them over. I didn't throw them. It didn't hit her. It didn't touch her body.
I'm not going to continue because I feel so much animosity coming from the other side of the table. I don't have to testify at this thing anymore. I don't have to go to court and testify. I don't have to do it. I don't feel good, and it's just annoying me. I'm on medicine, and I have a document that states I'm on medicine.

Page 59

MS. ROSEBUSH: What would you like to do, ma'am?
THE WITNESS: Idon't want to continue in this frame.
MS. ROSEBUSH: Do you understand that we will be moving to compel your deposition testimony?
THE WITNESS: What does that mean?
MS. ROSEBUSH: Means I'm going to court. I'm going to tell the judge you would not continue with this deposition. And I'm going to get a court order.
Since you've been identified by the plaintiff as a witness in this case and submitted two witness statements that I would like to ask you questions about, I'm going to get a court order requesting the court compel you to come and answer the questions.
THE WITNESS: Not if I'm on chemotherapy. They cannot make me go anywhere to court.
MS. ROSEBUSH: Is it your position that you're not going to answer any more of my questions?
THE WITNESS: I would really, you know -- this is too long for me. I don't want to

Page 60

continue right now.
MS. ROSEBUSH: Ms. Bourque, I had two conversations with you -- did I not -- and offered to postpone the deposition if you weren't feeling good, did I not?
THE WITNESS: When you're not feeling good on chemotherapy, you might not feel good one minute and you might feel good the next minute.
MS. ROSEBUSH: Did I not offer to postpone the deposition if you were not feeling well?
THE WITNESS: Yeah, I did.
MS. ROSEBUSH: What was your response?
THE WITNESS: I said "I'll be sick now. I'll be sick then. What's the difference?"
MS. ROSEBUSH: You told me to come today, except you told me you were not able to travel. I came to your home to take your deposition today; correct?
THE WITNESS: Uh-huh.
MS. ROSEBUSH: You have to answer verbally for record.
THE WITNESS: Yes.
MS. ROSEBUSH: It's your home. We'll

Page 61

leave. Deposition is suspended pending my application to the court for a court order to compel Ms. Bourque to continue answering my questions.
(Deposition suspended)

Page 62

REPORTER'S CERTIFICATE

I, SONYA LOPES, Certified Shorthand Reporter and Notary Public in and for the Commonwealth of Massachusetts, certify;

That the foregoing proceedings were taken before me at the time and place therein set forth, at which time the witness was properly identified and put under oath by me;

That the testimony of the witness, the questions propounded, and all objections and statements made at the time of the examination were recorded stenographically by me and were thereafter transcribed;

That the foregoing is a true and correct transcript of my shorthand notes so taken.

I further certify that I am not a relative or employee of any attorney of the parties, nor financially interested in the action.

I declare under penalty of perjury that the foregoing is true and correct.

Dated this 28th day of June, 2006.

Sonya Lopes My Commission Expires:
Notary Public March 29, 2013

Page 63

WITNESS: Estelle L. Bourque [Volume I]
DATE: June 28, 2006
CASE: Allyn Reynolds v. Fluor Industrial Services, Inc., et al.

DISTRIBUTION TO COUNSEL The original signature page/errata sheet was sent to Estelle Bourque. When signed, please send original to Windy Rosebush, Esq., who will supply a copy of the signed errata sheet to other counsel present at the deposition.

WITNESS INSTRUCTIONS After reading the transcript of your deposition, please note any change or correction and the reason for it on the errata sheet. DO NOT make any notations on the transcript itself. Use additional sheets if necessary.

SIGN AND DATE THE ERRATA SHEET before a notary public and return it, along with the transcript, to your counsel.

Page 64

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF RHODE ISLAND
Case No. 05-201-T

______________________

Allyn Reynolds
V.
Fluor Industrial Services,
Inc., et al.

______________________

I, ESTELLE L. BOURQUE, do hereby certify, under the pains and penalties of perjury, that the foregoing testimony is true and accurate, to the best of my knowledge and belief, with the addition of the following changes/corrections:

Page/ Line/ Change/Correction
___/___/______________________
___/___/______________________
___/___/______________________
___/___/______________________
___/___/______________________
___/___/______________________
___/___/______________________
___/___/______________________

WITNESS MY HAND, this day of , 2006.

______________________
ESTELLE L. BOURQUE

cc: Windy Rosebush, Esq.
Sandra A. Lanni, Esq.